**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------X   Case No.:

CRYSTAL GRANT,

                                Plaintiff,                **COMPLAINT**

     -against-

                                         **PLAINTIFF DEMANDS**
THE DOE FUND, INC., WILLIAM GLENN,     **A TRIAL BY JURY**
*Individually*, and EUNICE GILMORE, *Individually*

                           Defendants.

------------------------------------------------------------------X

Plaintiff CRYSTAL GRANT, by and through her attorneys, PHILLIPS & ASSOCIATES, ATTORNEYS AT LAW, PLLC, hereby complains of the Defendants, upon information and belief, as follows:

## NATURE OF THE CASE

1.   Plaintiff complains pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq*. ("Title VII"), 42 U.S.C. § 1981 ("Section 1981"), the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101 *et seq*. ("ADA"), the Family Medical Leave Act, 29 U.S.C. §§ 2601 *et seq*. ("FMLA"), the New York State Human Rights Law, New York State Executive Law, §§ 296 *et seq*. ("NYSHRL"), and the New York City Human Rights Law, New York City Administrative Code §§ 8-107 *et seq*. ("NYCHRL"), and seeks damages to redress the injuries Plaintiff has suffered as a result of being discriminated, retaliated against, and wrongfully terminated by Defendants on the basis of her sex/gender (female), race/color (African-American/black), actual or perceived disability (Sickle Cell Anemia, Posttraumatic Stress Disorder ("PTSD"), and Anxiety Disorder), and status as a victim of domestic violence, sex offenses or stalking, together with sexual harassment, resulting in Plaintiff suffering a hostile work

environment.

2.       Defendant THE DOE FUND, INC. is a not-for-profit corporation that provides economic

opportunity, transitional, affordable and supportive housing, and comprehensive social

services to underserved male populations, including people with histories of

homelessness, incarceration, poverty, substance abuse, and HIV/AIDS.

3.       Unfortunately, for a number of its female employees, including Plaintiff, Defendant THE

DOE FUND, INC. allowed for an intolerable sexually harassing and discriminatory work

environment, permeated with continuous unwelcomed sexual comments and statements

by the organization's employees and clients alike.

4.       Plaintiff actively resisted and continuously complained to her superiors about the

discrimination as she was experiencing it over the span of the three years that she worked

for THE DOE FUND, INC., but minimal action was taken to remedy the discrimination,

which continued to be rampant until Plaintiff's retaliatory termination.

## JURISDICTION, VENUE, AND PROCEDURAL PREREQUISITES

5.       This Court has subject matter jurisdiction over Plaintiff's claims pursuant to 42 U.S.C.

§2000e-5(f)(3), 42 U.S.C. §§ 12101 *et seq*. and 28 U.S.C. §§ 1331 and 1343.

6.       This Court has supplemental jurisdiction over Plaintiff's claims under the NYSHRL and

the NYCHRL pursuant to 28 U.S.C. § 1367.

7.       Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), as the acts complained

of occurred within the Southern District of New York.

1.       By: (a) timely filing a Verified Complaint with the New York City Commission on

Human Rights on October 17, 2019 which was cross-filed with the Equal Employment

Opportunity Commission ("EEOC"), and an Amended Charge of Discrimination with the

EEOC on February 3, 2020, (b) receiving a Notice of Right to Sue from the EEOC on

April 21, 2020, (c) commencing this action within 90 days of the issuance of the Notice of Right to Sue by the EEOC, and (d) contemporaneously with the filing of this Complaint, mailing copies thereof to the New York City Commission of Human Rights ("NYCCHR") and the Office of the Corporation Counsel of the City of New York pursuant to the notice requirements of § 8-502 of the New York City Administrative Code, Plaintiff has satisfied all of the procedural prerequisites for the commencement of the instant action. A copy of the Notice of Right to Sue is annexed hereto as "**Exhibit A**;" a copy of the transmittal letter to the NYCCHR *et ano*. is annexed hereto as "**Exhibit B**."

**PARTIES**

2. At all relevant times, Plaintiff was and is an African American female resident of the State of New York and County of New York.

3. Upon information and belief, Defendant THE DOE FUND, INC. ("THE DOE FUND") is a domestic not-for-profit corporation organized and existing as such under and by the virtue of the laws of the State of New York.

4. Defendant THE DOE FUND maintains a transitional housing unit in Harlem at 2960 Frederick Douglass Boulevard, New York, New York 10039, named the Harlem Center for Opportunity (the "Harlem Center").

5. At all relevant times, Plaintiff was an employee of Defendant THE DOE FUND, working at the Harlem Center.

6. At all relevant times, Defendant WILLIAM GLENN ("GLENN") was and is an employee of Defendant THE DOE FUND, holding the title of "Director" at Defendant THE DOE FUND's Harlem Center.

7. At all relevant times, Defendant GLENN was Plaintiff's supervisor and/or had supervisory authority over Plaintiff. Defendant GLENN had the authority to hire, fire,

affect the terms and conditions of Plaintiff's employment, or to otherwise influence the decisionmaker of the same.

8.    At all relevant times, Defendant EUNICE GILMORE ("GILMORE") was and is an employee of Defendant THE DOE FUND, holding the title of "Director of Human Resources" at Defendant THE DOE FUND.

9.    At all relevant times, Defendant GILMORE had the authority to hire, fire, affect the terms and conditions of Plaintiff's employment, and/or to otherwise influence the decisionmaker of the same.

10.   At all relevant times, Anthony Monroe ("Monroe") was and is an employee of Defendant THE DOE FUND, holding the title of "Director" at Defendant THE DOE FUND's Harlem Center.

11.   At all times relevant, Monroe was Plaintiff's supervisor and/or had supervisory authority over Plaintiff. Monroe had the authority to hire, fire, affect the terms and conditions of Plaintiff's employment, or to otherwise influence the decisionmaker of the same.

12.   Defendant GLENN and Defendant GILMORE are collectively referred to herein as "Individual Defendants."

13.   Defendants THE DOE FUND, GLENN, and GILMORE are collectively referred to herein as "Defendants."

## **MATERIAL FACTS**

14.   In or around February 2016, Plaintiff began her employment with Defendant THE DOE FUND as an "Administrative Assistant" in the social services department at the Harlem Center.

15.   In or around 2017, Plaintiff was promoted to "Case Manager," and in or around 2018 Plaintiff was promoted to "Senior Case Manager."

16.     Plaintiff's expected 2019 annual salary was $51,000.00 plus benefits.

17.     Plaintiff is approximately one of only six female employees out of a staff of over 100

        employees at the Harlem Center.

Sexual Harassment

18.     From the time her employment began, Plaintiff experienced a sexually hostile work

        environment permeated with inappropriate comments and statements from employees

        and clients of Defendant THE DOE FUND.

19.     By way of example, a former employee at Defendant THE DOE FUND – who upon

        information and belief had been transferred to the Harlem Center after being accused of

        sexual harassment at another facility of Defendant THE DOE FUND – **sent Plaintiff**

        **lewd photographs of himself and regularly watched pornography in plain sight on**

        **his work computer.**

20.     **Disturbingly, this former Director would also show Defendant THE DOE FUND's**

        **employees live videos of underaged individuals masturbating, to which he referred**

        **to as "bitches" and "sluts."**

21.     This employee had supervisory authority over Plaintiff at the time the above acts

        occurred, including authority to hire, fire, or affect the terms and conditions of Plaintiff's

        employment, or to otherwise influence the decisionmaker of the same.

22.     Plaintiff complained to Defendant GLENN about the sexual harassment including the

        pornography watching at work, to which Defendant GLENN responded that this was the

        reason why that Director got transferred to the Harlem Center, implying that the Director

        had a history of sexual harassment while employed at Defendant THE DOE FUND.

23.     **Defendant GLENN failed to take any action and/or further investigate Plaintiff's**

        **complaints, thereby acquiescing to the sexual harassment.**

DocuSign Envelope ID: F250BBF4-5C27-4DBF-9A5B-5B3785145BC6

24. Despite the multiple complaints about that employee, he was only terminated months later when he was arrested for selling drugs.

25. By way of another example of the rampant sexual harassment, Monroe, an Associate Director of Defendant THE DOE FUND, continually flirted with Plaintiff and asked her out on dates.

26. As Plaintiff was one of the youngest employees in the social services department, Monroe would refer to her as **"little girl," telling Plaintiff "hush [her] mouth," that she was "too young to tell [him] what to do" and that she was "just born yesterday."** These comments were often made in front of Defendant GLENN and Donald Pendleton ("Pendleton"), a Director at Defendant THE DOE FUND, who often made similar comments themselves, thereby participating and acquiescing in Plaintiff's discriminatory harassment.

27. Monroe would also frequently make inappropriate comments about Plaintiff's clothing, especially whenever she wore dresses at work.

28. By way of example, Monroe would state that **Plaintiff's dresses fit well "on all the right places."**

29. Moreover, Monroe commented on Plaintiff's way of walking, which he found to be **"sexy."**

30. Plaintiff discussed these comments with Defendant GLENN, but he refused her requests to schedule meetings to discuss these inappropriate comments.

31. Antonio Birch ("Birch"), a Case Manager at the Harlem Center, was also making Plaintiff extremely uncomfortable with his sexually inappropriate comments and continuous propositioning of Plaintiff from the beginning of Plaintiff's employment at Defendant THE DOE FUND.

DocuSign Envelope ID: F250BBF1-5C27-4DBF-9A5B-5B3795145DC6

32. **Birch sent Plaintiff flirtatious and sexually explicit text messages, including a lewd photograph of his penis, and once even showed her a video of him having sex with another woman.**

33. Birch commented on Plaintiff's appearance in front of clients, including telling Plaintiff that she was **"sexy,"** that her body looked good in particular outfits, and that it was **"hard not to stare at [her] beautiful breasts."**

34. Birch also told Plaintiff's clients that they were lucky to have such a **"beautiful"** case manager.

35. Birch also made inappropriate comments to other female employees would constantly comment on Plaintiff's and other female employees' appearances, body shape, and outfits in a sexually inappropriate manner that took place on an almost daily basis.

36. A client who was present during multiple of Birch's comments, including the comment about Plaintiff's breasts, submitted an incident report to Defendant GLENN regarding that comment.

37. From the beginning of Birch's sexually harassing conduct, Plaintiff had also been complaining to Defendant GLENN and to Pendleton, about it but to no avail. The harassing conduct continued until Plaintiff's termination.

38. Other female staff members also complained to Defendant GLENN and/or to Pendleton about Birch's discriminatory behavior but nothing was done to remedy the situation.

39. In the first half of 2018, an administrative assistant told Plaintiff that that Birch had kissed her on the cheek when they were walking to the train after work and that it had made her feel very uncomfortable. Plaintiff then scheduled a meeting for the assistant to complaint about Birch's inappropriate behavior to Defendant GLENN.

40. Upon information and belief, in or around the end of 2018, another case worker complained to Defendant GLENN about Birch being very flirtatious with her and that it made her uncomfortable.

41. Defendant THE DOE FUND has been continually put on notice about Birch's sexually harassing conduct, and the company did nothing to stop the harassment.

42. In fact, Defendant THE DOE FUND did not protect its employees and continued to employ Birch after they knew he was sexually harassing multiple female employees.

43. In or around May 2018, Defendant GLENN made sexually inappropriate comments to Plaintiff when she informed him that she had an order of protection issued against her former romantic partner, Kenneth Gregory ("Gregory"), and Defendant GLENN's response was that she should **be careful who [she] give[s] [her] pussy to."**

44. Clients of Defendant THE DOE FUND also made unwanted sexual advances to Plaintiff and when Plaintiff complained about the sexual harassment, the company did nothing.

45. By way of example, throughout Plaintiff's employment, clients of Defendant THE DOE FUND made unwanted sexual advances to Plaintiff and regularly called her **"sweetie," "sexy," "supermodel,"** and **"bad bitch."**

46. By way of another example, while Plaintiff was leading orientation sessions with groups of new clients, the clients would often interrupt her to make sexual comments about her appearance.

47. Plaintiff would report the comments to Defendant GLENN, but upon information and belief he did not take any action against it.

48. Clients would similarly make sexual comments about Plaintiff's appearance during "house meetings," which took place about twice per month, and in which all staff and clients participated.

49.  During these meetings, while Plaintiff was speaking, clients would yell comments such as **"You're the baddest! I want you to be my case manager!"**

50.  Clients would also whistle suggestively at her while she was speaking.

51.  While this was taking place, staff members of Defendant THE DOE FUND, including Defendant GLENN, would laugh at the clients' comments and even encourage their commentary, thereby acquiescing to the sexual harassment.

52.  In or around late 2017, a client of Defendant THE DOE FUND had downloaded pictures from Plaintiff's social media accounts to his smartwatch and was spreading rumors that Plaintiff was his girlfriend.

53.  Plaintiff complained to Defendant GLENN who laughed her complaint off, thereby once again acquiescing to the sexual harassment.

54.  In or around September 2018, a client of Defendant THE DOE FUND wrote two letters to Plaintiff in which he asked Plaintiff out and graphically described sexual acts in which he would like to engage with Plaintiff, including **"dropping to [his] knees and kissing [her] navel" and "caress[ing] [her] nipples with [his] tongue" while his "hands squeeze [her] ass."**

55.  Plaintiff informed Pendleton and Defendant GLENN and requested a meeting with them.

56.  However, Defendant GLENN and Pendleton refused to meet with Plaintiff to discuss this situation and Defendant GLENN told Plaintiff that the client was "harmless" and that **she should expect this type of behavior given that she was "the youngest and sexiest girl in the office," which made it hard for men to not be attracted to her.**

57.  Defendant GLENN also told Plaintiff that she should have "tougher skin."

58.  The client continued to send the sexual letters to Plaintiff and told her "there is more to come."

59.     In or around November 2018, a client gave Plaintiff a card in which he had written sexually explicit statements. The card also included a hundred dollars, which Plaintiff returned to the client.

60.     Plaintiff immediately complained about it to Defendant GLENN, but the sexual harassment by that specific client continued.

61.     Specifically, the client told Plaintiff that he was "sick" and Plaintiff was the only one that could "heal" him, implying that having sexual relations with Plaintiff would heal him, and also called her his "queen."

62.     He also told Plaintiff that he wanted to give her his life savings, which Plaintiff reported to the client's case manager and to the Community Improvement Project Director, who reported it to Defendant GLENN.

63.     It was only then that Defendant GLENN met with the client to address his behavior.

<u>Plaintiff Continuously Complained About the Sexual Harassment to Defendant GLENN and other Agents of Defendant THE DOE FUND</u>

64.     On each of the above listed occasions, Plaintiff complained to Defendant GLENN about the sexual harassment that she was experiencing by both staff members and clients.

65.     Plaintiff started complaining about the sexually hostile work environment from as early as three months into her job, to which Defendant GILMORE responded that **"this is a male-dominated organization" and advised her not to dress "provocatively."**

66.     In or around 2017, Plaintiff also met with Defendant GILMORE to complain about the sexual comments that clients would make during meetings and about the client spreading false rumors that he was Plaintiff's boyfriend.

67.     Defendant GILMORE informed Plaintiff that she would follow up with Defendant GLENN about Plaintiff's complaints.

68. However, upon information and belief, despite Plaintiff's complaints, the individuals that Plaintiff complained about were never disciplined or asked to refrain from sexually harassing her.

69. **In or around June 2017, Plaintiff realized that complaints of sex/gender discrimination were not being taken seriously by Defendant THE DOE FUND when Defendant GLENN made copies of a former female employee's federal Complaint and Summons, passed it around to Plaintiff and other employees of the Harlem Center and stated that women could not be filing sexual harassment complaints "when they're beautiful and work around a bunch of niggers."**

70. In or around October 2017, Plaintiff complained to the NYC Department of Homeless Services ("DHS"), the administrative agency overseeing the provision of services that Defendant THE DOE FUND provides to the homeless, about the sexual harassment that she had been experiencing at Defendant THE DOE FUND.

71. Upon information and belief, Defendant GLENN was immediately notified of Plaintiff's complaint.

72. Instead of investigating her allegations, Defendant GLENN became upset that Plaintiff involved DHS and instructed Plaintiff not to contact DHS directly but to always go through him.

73. Felipe Vargas ("Vargas"), the Vice President of Programs at Defendant THE DOE FUND was also present and emphasized that Plaintiff had to stop contacting DHS, while mentioning that Defendant THE DOE FUND had a powerful legal team in a manner that Plaintiff perceived to be intimidating and intended to prevent her from further complaining about her conditions of employment.

74.    In or around July 2018, Plaintiff asked Defendant GLENN about whether he had talked to Birch about the unwanted sexual advances towards Plaintiff, to which Defendant GLENN responded, "not yet" and stated that he believed that Plaintiff and Birch were in a consensual romantic relationship and that Plaintiff needed to keep whatever was happening with Birch "outside of work."

75.    Outraged, Plaintiff contradicted Defendant GLENN's statements.

76.    On or about August 22, 2018, Plaintiff again met with Defendant GILMORE and complained about Birch's inappropriate behavior, which had repercussions even in her personal life, as her domestic violence abuser had seen some of Birch's inappropriate messages and had lashed out on Plaintiff.

77.    On or about December 11, 2018, Plaintiff met with Defendant GILMORE to again complain about Birch's behavior and about the fact that he had been continuously contacting Plaintiff outside of work and have even shown up at her home unannounced.

78.    During that meeting, Plaintiff requested to be transferred to another location of Defendant THE DOE FUND in order to escape the ongoing sexual harassment from Defendant THE DOE FUND's employees and clients, but her request was denied by Defendant GLENN and Pendleton on the basis that she was irreplaceable at the Harlem Center and was needed to manage the caseload.

79.    **Despite Plaintiff's repeated complaints of unlawful sexual harassment and discrimination, Defendants continued to discriminate against Plaintiff and both employees and clients alike continued to sexually harass Plaintiff without any further investigation being initiated.**

80.    Overall, throughout her employment at Defendant THE DOE FUND, Plaintiff met with Defendant GILMORE at least four times in person and spoke to her on the phone at least

six times to complain about the discrimination that she had been experiencing.

81.    **On one occasion, Defendant GILMORE stated that if Plaintiff wanted to avoid harassment, she should "tone down" her sex appeal and told Plaintiff to avoid wearing padded bras and dresses, as they were too "provocative."**

82.    This dress-code "advice" was later circulated to all employees by email.

83.    However, given that most of the men had to wear a specific uniform at work, this policy was mostly targeted towards women and attempted to solve the rampant sexual harassment problem effectively by changing the female employees' way of dressing instead of by disciplining the sexual harassers.

84.    Exasperated by the way that no one at Defendant THE DOE FUND was taking her complaints seriously, Plaintiff emailed Harriet Karr-McDonald ("Karr-McDonald"), Defendant THE DOE FUND's co-founder, to complain about the sexual harassment and hostile work environment that she had been experiencing, to which she never received a response.

85.    On or about December 13, 2018, during Defendant THE DOE FUND's Holiday Party, two employees of Defendant THE DOE FUND's main offices, which is located at 232 East 84th Street. New York, New York 10028, told Plaintiff that she was very "popular" at their office and was being talked about "a lot."

86.    Plaintiff asked the two employees if they were referring to her complaints.

87.    The employees responded in the affirmative and stated that nothing was going to happen about Plaintiff's complaints because "[George McDonald, the co-founder of Defendant THE DOE FUND] is the same way."

88.    On or about January 9, 2019, Plaintiff went herself to the main offices and told Karr-McDonald that she wanted to discuss with her the hostile work environment that she had

13

been experiencing at Defendant THE DOE FUND. Karr-McDonald told Plaintiff that she was busy and that her secretary would call her to schedule a meeting. Plaintiff never received such a call.

Race/Color Discrimination

89.  Plaintiff also was subjected to severe and pervasive race/color discrimination at Defendant THE DOE FUND.

90.  Everyone who worked in Plaintiff's social services department was African American/Black.

91.  Although the staff in the social services department and the graduate services department had comparable levels of education and experience, the social services department was being referred to as **"The Projects"** by staff members of Defendant THE DOE FUND, whereas the graduate services department was referred to as "The Penthouse."

92.  The graduate services department was almost entirely staffed by White employees.

93.  Defendant GLENN and other managerial employees at Defendant THE DOE FUND were aware that staff members referred to the area where the social services department was as "The Projects" and would laugh when they heard this terminology being used.

94.  Plaintiff felt extremely uncomfortable from the usage of this terminology to describe her predominantly black department as less than the predominantly White department.

95.  Moreover, upon information and belief, Plaintiff's department was the only department of Defendant THE DOE FUND not being paid overtime wages for work that exceeded 40 hours per week.

96.  In regards to sexual harassment complaints, upon information and belief, Defendant THE DOE FUND did take complaints of unwanted sexual comments or advances by White

female employees more seriously.

97.  Specifically, when a white female employee of Defendant THE DOE FUND complained to Defendant GLENN that a client of hers had discussed his foot fetish with her and had told her that she had pretty feet, Defendant GLENN immediately transferred her client to another facility within 24 hours.

98.  When Plaintiff confronted Defendant GLENN about transferring that client but never transferring any of the clients that had been sexually harassing Plaintiff, Defendant GLENN responded **"you know what HR would do if they found out one of the White girls were harassed. Come on, Crystal."**

99.  Defendant GLENN's comments made it clear to Plaintiff that as a Black woman she was being treated differently than her White coworkers, and that her complaints of sexual harassment were not and would not be taken seriously by Defendant THE DOE FUND.

<u>Disability Discrimination</u>

100.  Plaintiff also suffered disability discrimination by Defendant THE DOE FUND.

101.  Plaintiff was disabled within the meaning of the ADA and/or Defendant THE DOE FUND perceived Plaintiff to be disabled.

102.  Plaintiff suffers from Sickle Cell Anemia, PTSD, and Anxiety Disorder, which she disclosed to Defendant GILMORE when she started working at Defendant THE DOE FUND.

103.  Plaintiff is a qualified individual who can perform the essential functions of her employment with a reasonable accommodation as defined by §12111(8) of the ADA.

104.  Plaintiff's Sickle Cell Anemia is a form of anemia in which red blood cells are misshapen and/or shaped in the form of a "U", which causes slow or decreased blood flow if the blood cells become stuck in blood vessels. These accumulations of misshapen red blood

cells can slow or block blood flow and oxygen to parts of the body. Such instances can cause extreme pain, as well as a host of other physical complications if not treated. Persons suffering from Sickle Cell Anemia experience an occasional painful "crisis" and/or "crises," which are health complications caused by Sickle Cell Anemia.

105. Plaintiff experiences Sickle Cell related crises periodically and has no control over same with regard to when, where or how a crisis will occur.

106. Plaintiff's Sickle Cell Anemia is a physical impairment that substantially limited one or more major life activities within the meaning of § 12102(1)(A) of the ADA, including, but not limited to breathing and walking.

107. Plaintiff's PTSD is a mental impairment that substantially limited one or more major life activities within the meaning of § 12102(1)(A) of the ADA, including, but not limited to, concentrating and thinking.

108. Plaintiff's Anxiety Disorder is a mental impairment that substantially limited one or more major life activities within the meaning of § 12102(1)(A) of the ADA, including, but not limited to, concentrating and thinking.

109. In or around the summer of 2018, Plaintiff asked Defendant GLENN for some time off as she was not feeling well due to her Sickle Cell Anemia.

110. Defendant GLENN denied Plaintiff's request for a reasonable accommodation, without engaging in any interactive process with Plaintiff, without advising Plaintiff of her rights under the FMLA, and without even attempting to accommodate Plaintiff.

111. Plaintiff had also emailed Defendant GILMORE about her request but to no avail.

112. At the time of her request for a reasonable accommodation, Plaintiff had been employed by Defendant THE DOE FUND for about two and a half years and had performed the requisite hours of work to be qualified for FMLA leave.

113. In or around August 2018, Plaintiff requested two weeks off of work due to her PTSD and Anxiety Disorder, which were also denied by Defendant GLENN.

114. Defendant GLENN again denied Plaintiff's request for a reasonable accommodation, without engaging in any interactive process with Plaintiff, without advising Plaintiff of her rights under the FMLA, and without even attempting to accommodate Plaintiff.

115. Between June 2018 and November 2018, Plaintiff repeatedly asked for time off of work in order to attend psychotherapy. Defendant GLENN told Plaintiff that any time off from work would have to be unpaid but then rejected her requests for unpaid time off.

116. In or around November 2018, Plaintiff again requested a medical leave due to her disabilities from Defendant GLENN and Defendant GILMORE.

117. Plaintiff repeatedly followed up with Defendant GLENN and Defendant GILMORE about her request, but they would ignore her and state that they would "get back to [her]."

118. Soon after, Plaintiff complained to Vargas, the Vice President of Programs at Defendant THE DOE FUND, about not getting any response about her requested medical leave and about her past requests for medical leaves having been denied, to which he stated, **"Who are you to ask for medical leave?"**

119. Vargas's statement and Defendants' GLENN and GILMORE denying and/or ignoring Plaintiff's requests for reasonable accommodations unlawfully interfered with Plaintiff's rights under Federal, State, and City laws

120. On or about January 7, 2019, Plaintiff was hospitalized as she was feeling physically and mentally exhausted, and was experiencing abdominal pains, a common symptom of Sickle Cell disease.

121. At all relevant times, Defendants were aware of Plaintiff's disabilities and her need and requests for reasonable accommodations.

122. Without considering the interactive process, Plaintiff's rights under the FMLA and/or Plaintiff's apparent and obvious deteriorating medical conditions, Defendants, collectively and individually, ignored Plaintiff's disabilities, needs, rights and requests for accommodations.

123. At no time did Defendants intend to offer Plaintiff accommodations as is required under Federal, State, and/or City laws.

Domestic Violence Victim Status Discrimination

124. When Plaintiff began working at Defendant THE DOE FUND, she disclosed to Defendant GILMORE that she had been a victim of sex offenses and domestic violence and that, as a result of her past experience, she had an injury in her left hand.

125. In or around May 2018, Plaintiff informed Defendant GLENN that she had an order of protection issued against her former partner, Gregory due to multiple incidents of continuous domestic violence.

126. **Defendant GLENN responded that Plaintiff should "be careful who [she] give[s] [her] pussy to."**

127. In or around June 2018, Plaintiff contacted Defendant GILMORE to discuss the escalating violence that Plaintiff had been facing in the hands of her former partner.

128. On or about June 12, 2018, Plaintiff met with Defendant GLENN and Pendleton to discuss various safety concerns of hers in regard to Gregory and requested some time off, which Defendant GLENN and Pendleton denied.

129. Plaintiff also provided Defendant GLENN and Pendleton with copies of a police report against Gregory and of the order of protection that had been issued against him.

130. It was not until or around late summer or early fall of 2018 that Plaintiff's request was accommodated, and she was able to work on weekends and have Mondays off of work.

131.   In or around August 2018, Gregory appeared at Plaintiff's job at the Harlem Center and in front of several individuals slapped Plaintiff.

132.   Plaintiff called the police and asked Defendant THE DOE FUND's security staff members to write an incident report about the incident, as was protocol, but they refused.

133.   Plaintiff then contacted Defendant GILMORE and told her what had taken place.

134.   Upon information and belief, Defendant GILMORE informed Defendant GLENN about the incident of domestic violence between Plaintiff and Gregory.

135.   Upon information and belief, Defendant GLENN did not file a report of this incident, even though the Defendant THE DOE FUND's policy would have required him to report that the police were called to the organization's facility.

136.   Soon after the incident, Plaintiff again contacted Defendant GILMORE and updated her on how abusive Gregory had become.

137.   In response, Defendant GILMORE sent out an email to all staff banning Gregory from the Harlem Center.

138.   Upon information and belief, around this time, Gregory approached one of Plaintiff's coworkers—a man who regularly commuted to work with Plaintiff—and threatened him.

139.   The coworker then told Plaintiff that he had reported the incident to Defendant GLENN.

140.   Gregory continued to be abusive and to threaten violence and even deadly physical injuries upon Plaintiff.

141.   On or about September 2, 2018, Plaintiff messaged the Manhattan District Attorney's Office's Facebook page in fear of her own and her children's safety after Gregory called her and threatened deadly physical violence upon her.

142.   After Plaintiff's Facebook message was sent, two security staff members from Defendant THE DOE FUND received her message, which upon information and belief was also sent to multiple Facebook friends of Plaintiff's as part of Facebook's domestic violence security measures.

143.   Upon information and belief, the security staff members informed Defendant GLENN about the incident and that they have left their posts to go to Plaintiff's rescue because they believed she was in danger.

144.   On or about November 4, 2018, Gregory was charged with Aggravated Harassment in the Second Degree.

145.   Plaintiff informed Defendant GLENN, Pendleton, and Defendant GILMORE herself about the assault shortly after it occurred.

146.   Plaintiff also met with Pendleton and Defendant GLENN to complain about Birch getting involved in her personal life, and inciting domestic violence incidents, to which Defendant GLENN warned Plaintiff to **"keep the bullshit out of the office."**

147.   On or about October 5, 2018, Gregory again came to the Harlem Center looking for Plaintiff. Plaintiff asked for the police to be called, but instead, Birch went outside and confronted Gregory, despite multiple meetings about him not getting involved in Plaintiff's personal life.

148.   On or about November 21, 2018, Gregory broke into her home while she was sleeping and physically assaulted her.

149.   Plaintiff shared a copy of the police report with Defendant GLENN and Defendant GILMORE.

150.   On or about December 11, 2018, and after the multiple incidents of Gregory showing up to her job unannounced, Plaintiff met with Defendant GILMORE and requested to be

transferred to another location of Defendant THE DOE FUND so that her domestic violence abuser would not know her work location and would not be able to harass her at her workplace.

151. Plaintiff even offered to accept a demotion for the sake of feeling safer at her work environment, but her request was rejected.

152. On or about January 8, 2019, Plaintiff requested that she get the day off on January 10, 2019, because she had to attend a court hearing in order to testify against Gregory, who was scheduled to be released from custody that day.

153. Plaintiff informed Defendant GLENN about the exact reason behind her request.

154. However, Defendant GLENN denied Plaintiff's request for time off.

155. On or about January 9, 2019, Plaintiff met with Defendant GLENN and another employee of Defendant THE DOE FUND. During the meeting, the other employee stated that Plaintiff **"should be fired for all the domestic violence drama that [she] brings to the office."**

156. Defendant GLENN did not respond to the employee's comment, thereby acquiescing to the discrimination.

157. Upon information and belief, Defendants never logged into the CARES system any of the incident reports against Gregory as was required by protocol.

<u>Plaintiff was Terminated in Retaliation for Her Multiple Complaints of Discrimination</u>

158. On or about January 8, 2019, Plaintiff complained to a DHS representative about Defendants' discriminatory acts and comments. Plaintiff also stressed that she was worried that she would lose her job because she was a victim of domestic violence and had been speaking out against sexual harassment.

159. The DHS representative told Plaintiff that she should quit her job and that Defendant

DocuSign Envelope ID: F250BBF1-5C27-4DDF-9A5B-53270F1459C6

GLENN did not want her working at Defendant THE DOE FUND.

160. Upon information and belief, Defendants were immediately made aware of Plaintiff's complaints to DHS.

161. On or about January 9, 2019, Plaintiff complained to another DHS representative about the hostile work environment that she had been experiencing, as well as about the sexual harassment, and stated that she did not want to work under those conditions any longer.

162. Upon information and belief, that DHS representative informed Defendant GILMORE about Plaintiff's complaints.

163. Soon after, Defendant GILMORE told Plaintiff that she had heard that she had been complaining to DHS and that she did not want to work for Defendant THE DOE FUND any longer.

164. Plaintiff admitted that she had called DHS but explained that she did not say that she did not want to work at Defendant THE DOE FUND but that she did not want to work under the existing work conditions any longer, referring to the hostile work environment.

165. On or about January 10, 2019, and merely two days after Plaintiff's complaint with DHS, Defendant GLENN and Defendant GILMORE called Plaintiff into a meeting and informed her that she was being terminated because she had allegedly violated Defendant THE DOE FUND's conflict of interest policy by engaging in sexual relationships with clients.

166. Soon after her meeting with Defendant GLENN and Defendant GILMORE, Plaintiff went to Pendleton's office and asked him if he knew that she was being terminated, to which he responded that he did not.

167. Plaintiff then told Pendleton, Defendant GLENN, and Defendant GILMORE that she could not believe that she was being terminated not only because the reason was false but

also because she was a victim of domestic violence and felt that she was being punished for it, to which Defendant GILMORE stated, "just because you say that [you are a victim of domestic violence], doesn't mean that it's true."

168.  Plaintiff further disputed the discriminatory and/or retaliatory termination via a number of email communications to Defendant GILMORE but to no avail.

169.  Plaintiff's termination was clearly retaliatory, and the reason provided pretextual and false as Plaintiff had not engaged in sexual relationships with active clients while she was working for Defendant THE DOE FUND and she had informed them in March 2018 that she was dating a *former* graduate of Defendant THE DOE FUND, which Defendant GLENN had stated was *not* a conflict of interest.

170.  Specifically, Plaintiff informed Defendant GLENN and Pendleton, in or around the end of March 2018, that she was dating Gregory who was a graduate of Defendant THE DOE FUND's program and whom Plaintiff had met before she started working for the organization.

171.  Pendleton assured Plaintiff that there was no issue with her dating Gregory since he was a former and not a current client of the organization.

172.  Defendant GLENN agreed with Pendleton and added that if it was a conflict for staff members to date former clients, "no one could date anyone."

173.  Despite Plaintiff's multiple complaints of sexual harassment, no investigation has ever been initiated and/or corrective action has been taken against any of the harassers.

174.  Plaintiff has been informed that since Plaintiff's termination Defendant GLENN has been spreading false rumors about Plaintiff having engaged in sexual relations with clients.

175.  Plaintiff was unlawfully treated, humiliated, degraded, victimized and embarrassed and, as a result, suffers loss of rights, emotional distress, and physical ailments and injuries.

176.    Defendants' actions and conduct were intentional and intended to harm Plaintiff.

177.    As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer emotional pain, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

178.    Plaintiff has further experienced severe emotional and physical distress.

179.    Defendants' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law.

180.    As such, Plaintiff demands punitive damages as against all the Defendants, jointly and severally.

### AS A FIRST CAUSE OF ACTION
### DISCRIMINATION UNDER TITLE VII
### (Against Defendant THE DOE FUND)

181.    Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

182.    Title VII prohibits an employer from discriminating against any individual with respect to their terms, conditions, or privileges of employment because of such individual's **sex**, **race**, and **color**.

183.    Plaintiff is an employee and a qualified person within the meaning of Title VII and Defendant THE DOE FUND is a covered employer within the meaning of Title VII.

184.    Defendant THE DOE FUND unlawfully discriminated against Plaintiffs in violation of Title VII by discriminating against Plaintiffs because of her **sex (female)**, **race (African American)**, and **color (black)**.

### AS A SECOND CAUSE OF ACTION
### RETALIATION UNDER TITLE VII
### (Against Defendant THE DOE FUND)

185.    Plaintiff repeats and realleges each and every allegation made in the above paragraphs of

this Complaint.

186.   Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e-3(a) provides that

it shall be unlawful employment practice for an employer:

> (1) to . . . discriminate against any of his employees . . .
> because [s]he has opposed any practice made an
> unlawful employment practice by this subchapter, or
> because [s]he has made a charge, testified, assisted or
> participated in any manner in an investigation,
> proceeding, or hearing under this subchapter.

187.   Defendant THE DOE FUND engaged in unlawful employment practice prohibited by 42

U.S.C. § 2000e *et seq.* by discriminating against Plaintiffs with respect to the terms,

conditions or privileges of employment because of their opposition to the unlawful

employment practices of Defendant THE DOE FUND.

## <u>AS A THIRD CAUSE OF ACTION</u>
## DISCRIMINATION UNDER SECTION 1981

188.   Plaintiff repeats and realleges each and every allegation made in the above paragraphs of

this Complaint.

189.   42 U.S.C. § 1981 states in relevant part as follows:

1.   Statement of equal rights

All persons within the jurisdiction of the United States shall have the same
right in every State and Territory to make and enforce contracts, to sue, be
parties, give evidence, and to the full and equal benefit of all laws and
proceedings for the security of persons and property as is enjoyed by white
citizens, and shall be subject to like punishment, pains, penalties, taxes,
licenses, and exactions of every kind, and to no other.

2.   "Make and enforce contracts" defined

For purposes of this section, the term "make and enforce contracts"
includes the making, performance, modification, and termination of
contracts, and the enjoyment of all benefits, privileges, terms, and
conditions of the contractual relationship.

190.    Plaintiff was discriminated against on the basis of her race/color (African American/Black) as provided under Section 1981 and has suffered damages as set forth herein.

**AS A FOURTH CAUSE OF ACTION**
**DISCRIMINATION UNDER THE ADA**
**(Against Defendant THE DOE FUND)**

191.    Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

192.    Section 12112 of the ADA, titled "Discrimination," provides: "(a) General rule. - No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."

193.    Plaintiff was discriminated against on the basis of her disabilities (Sickle Cell Anemia, PTSD, and Anxiety Disorder) and has suffered damages as set forth herein.

**AS A FIFTH CAUSE OF ACTION**
**RETALIATION UNDER THE ADA**
**(Against Defendant THE DOE FUND)**

194.    Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

195.    The ADA prohibits retaliation, interference, coercion, or intimidation.

196.    42 U.S.C. § 12203 provides:

     i.    Retaliation. No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.

    ii.    Interference, coercion, or intimidation. It shall be unlawful to coerce,

intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on account of his or her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter.

197. Defendant THE DOE FUND violated this section as set forth herein.

## AS A SIXTH CAUSE OF ACTION
## DISCRIMINATION UNDER THE FMLA

198. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

199. Section 2612(d)(2)(B) of the FMLA, states in pertinent part: "an eligible employee shall be entitled to a total of 12 work weeks of leave during any 12-month period . . . Because of a serious health condition that makes the employee unable to perform the functions of the position of such employee."

200. Section 2615(a) of the Family Medical Leave Act, states in pertinent part:

Interference with rights. (1) Exercise of rights. It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter. (2) Discrimination. It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter.

201. Defendant THE DOE FUND violated this section as set forth herein.

## AS A SEVENTH CAUSE OF ACTION
## DISCRIMINATION UNDER THE NYSHRL

202. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

203. Executive Law § 296 provides that,

1. It shall be an unlawful discriminatory practice: (a) For an employer or licensing agency, because of an individual's age, **race**, creed, **color**, national origin, sexual orientation, military status, **sex**, **disability**, predisposing genetic characteristics, marital status, or **domestic violence**

27

**victim status**, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment.

204. Defendants engaged in an unlawful discriminatory practice by discriminating against Plaintiff because of her sex (female), race/color (African American/black), disability (Sickle Cell Anemia, PTSD, and Anxiety Disorder) and domestic violence victim status.

## AS AN EIGHTH CAUSE OF ACTION
### RETALIATION UNDER THE NYSHRL

205. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

206. Executive Law § 296 provides that, "7. It shall be an unlawful discriminatory practice for any person engaged in any activity to which this section applies to retaliate or discriminate against any person because he or she has filed a complaint, testified, or assisted in any proceeding under this article."

207. Defendants engaged in an unlawful discriminatory practice by discriminating against Plaintiff because of his opposition to the unlawful employment practices of the Defendants.

## AS A NINTH CAUSE OF ACTION
### AIDING AND ABETTING UNDER THE NYSHRL
### (Only Against Individual Defendants)

208. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

209. New York State Executive Law § 296(6) provides that it shall be unlawful discriminatory practice: "For any person to aid, abet, incite compel or coerce the doing of any acts forbidden under this article, or attempt to do so.

210. Individual Defendants violated the section cited herein as set forth.

28

## AS A TENTH CAUSE OF ACTION
## DISCRIMINATION UNDER THE NYCHRL

211. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

212. The New York City Administrative Code §8-107(1) provides: It shall be an unlawful discriminatory practice: (a) For an employer or an employee or agent thereof, because of the actual or perceived … **race** … **color** … **gender**, **disability,** of any person, to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment.

213. Individuals who are **victims/survivors of domestic violence, sex offenses, or stalking** are also protected against discrimination in employment by the NYCHRL.

214. Defendants have engaged in unlawful discriminatory practices in violation of the NYCHRL by creating and maintaining discriminatory working conditions, and otherwise discriminating against Plaintiff because of her sex (female), race/color (African American/black), disability (Sickle Cell Anemia, PTSD, and Anxiety Disorder) and domestic violence victim status.

## AS AN ELEVENTH CAUSE OF ACTION
## RETALIATION UNDER THE NYCHRL

215. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

216. The New York City Administrative Code §8-107(7) provides that it shall be unlawful discriminatory practice: "For an employer . . . to discriminate against any person because such person has opposed any practices forbidden under this chapter. . ."

217. Defendants engaged in an unlawful discriminatory practice in violation of New York City Administrative Code §8-107(7) by discriminating against Plaintiff because of Plaintiff's

opposition to the unlawful employment practices of the Defendants.

## AS A TWELVTH CAUSE OF ACTION
## AIDING AND ABETTING UNDER THE NYCHRL
### (Against Individual Defendants)

218. Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint.

219. The New York City Administrative Code §8-107(6) provides that it shall be unlawful discriminatory practice: "For any person to aid, abet, incite, compel; or coerce the doing of any of the acts forbidden under this chapter, or attempt to do so."

220. Individual Defendants engaged in an unlawful discriminatory practice in violation of New York City Administrative Code §8-107(6) by aiding, abetting, inciting, compelling and coercing the above discriminatory, unlawful and retaliatory conduct.

## JURY DEMAND

221. Plaintiff hereby requests a jury trial.

**WHEREFORE**, Plaintiff respectfully requests a judgment against the Defendants:

A. Declaring that Defendants engaged in unlawful employment practices prohibited by Title VII, Section 1981, the ADA, the FMLA, the NYSHRL, and the NYCHRL, in that Defendants subjected Plaintiff to race/color (African American/black), disability (Sickle Cell Anemia, PTSD, and Anxiety Disorder), gender/sex (female), and domestic violence victim status discrimination and retaliation;

B. Awarding damages to Plaintiff for all lost wages and benefits, past and future, back pay and front pay, resulting from Defendants' unlawful employment practices and to otherwise make Plaintiff whole for any losses suffered as a result of such unlawful employment practices;

C.      Awarding Plaintiff compensatory damages for mental, emotional and physical injury, distress, pain and suffering and injury to reputation;

D.      Awarding Plaintiff punitive damages;

E.      Awarding Plaintiff attorneys' fees, costs, and expenses incurred in the prosecution of the action;

F.      Awarding Plaintiff such other and further relief as the Court may deem equitable, just and proper to remedy the Defendants' unlawful employment practices.

Dated:  New York, New York
        July 17, 2020

                              **PHILLIPS & ASSOCIATES,**
                              **ATTORNEYS AT LAW, PLLC**


                              Brittany A. Stevens, Esq.
                              Katerina Housos, Esq.
                              *Attorneys for Plaintiff*
                              45 Broadway, Suite 430
                              New York, New York 10006
                              T: (212) 248 - 7431
                              F: (212) 901 - 2107
                              bstevens@tpglaws.com
                              khousos@tpglaws.com